# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | : | |
|---|---|---|
| | : | Criminal No. 1:08-CR-171-2 |
| v. | : | |
| | : | (Chief Judge Kane) |
| FRANCISCO D. PEREZ, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

## I. INTRODUCTION

Pending before the Court is Defendant Francisco Perez's motion to suppress evidence seized from his home in Reading, Pennsylvania, following his warrantless, in-home arrest. (Doc. No. 32.)[1] The Court heard evidence and argument on the motion over the course of two hearings, held on August 28, 2008, and November 4, 2008. For the reasons that follow, the Court finds that the motion must be denied because Perez's wife consented voluntarily to law enforcement officers' request for permission to search the house, and the search was therefore lawful.

## II. FACTUAL BACKGROUND[2]

On April 20, 2008, a Missouri State Trooper stopped a tractor trailer traveling eastbound on Interstate 70. The truck's driver consented to the trooper's request to search the trailer and the

---

[1] Defendant also filed an amended motion seeking the same relief. (Doc. No. 33.) For simplicity, the Court will refer to the motions collectively as one motion.

[2] During the hearing on August 28, 2008, the government provided testimony from Special Agent Dionysios Mihalopoulos, the resident agent in charge of the Allentown office of the Drug Enforcement Agency ("DEA"). When the hearing resumed on November 4, 2008, the government presented evidence from Detective Pasquale Leporace, a criminal investigator with the City of Reading Police Department, and from Corporal Todd Harris of the Pennsylvania State Police. Defendant did not call any witnesses during either hearing. The factual recitation contained in this memorandum is taken from testimony that the Court has credited for purposes of adjudicating the pending motion to suppress.

subsequent search revealed between 350 and 400 pounds of marijuana.³ (Transcript 6) (hereafter "T. __".) The driver agreed to cooperate with law enforcement officers and to serve as a confidential source of information regarding the destination of the drugs. (T. 6.)

The confidential source informed investigators that he intended to deliver between 350 and 400 pounds of the marijuana to two individuals in Reading, Pennsylvania, whom he identified only as "Frank" and "Timo." (T. 6-7.) DEA agents showed the confidential source a photograph of a target from the Reading area known as "Timo," and the source confirmed that this was one of the two men to whom he was delivering the drugs. (T. 7.) Investigators later determined that "Timo" was the nickname of Defendant Cauhtemoc Remingio-Martinez. (T. 7-8.) The confidential source also told investigators that "Frank" lived in the area of 510 Minor Street in Reading, Pennsylvania. (T. 9.) Investigators subsequently consulted computer databases and determined that a Francisco Perez had vehicles registered to him at the 510 Minor Street address. (T. 11.) The confidential source advised investigators that Perez recruited him to become involved in drug trafficking and that the confidential source lived three houses from 510 Minor Street. (T. 11.)

Members of a DEA investigative team arranged for a controlled delivery of the drugs to Perez and Remingio-Martinez in Pennsylvania. On April 20, 2008, the confidential source participated in monitored telephone calls with Messrs. Perez and Remingio-Martinez concerning arrangements for the delivery of the marijuana to take place the following day. (T. 12.)

On April 21, 2008, the date on which the controlled delivery to Perez and Remingio-

---

³ According to information that had been provided to Special Agent Mihalopoulos, the trailer originally carried approximately 1,200 pounds of marijuana, of which a substantial percentage had been delivered elsewhere in Missouri.

2

Martinez was to take place, Corporal Todd Harris of the Pennsylvania State Police conducted surveillance on Mr. Perez, including following him as he drove in the city of Reading. (T. 15-16.) At some point, officers observed Mr. Perez driving in a manner that suggested counter-surveillance and Corporal Harris suspended his surveillance efforts. (T. 16.) Also on April 21, Mr. Remingio-Martinez drove a car registered to Perez to Richland, Pennsylvania, where he met with the confidential source and accepted delivery of one box of marijuana, which he placed in Perez's car. (T. 16-17, 89.) The transaction was monitored on videotape. (T. 19.) Mr. Remingio-Martinez was thereafter arrested at the scene and taken to a neutral location. (T. 17.) Mr. Perez never appeared at the Richland location where the drug sale took place.

Following this transaction, Mr. Remingio-Martinez's cell phone received several calls from Perez and some of these calls may have been recorded and monitored by law enforcement officers.[4] (T. 17.) Agent Mihalopoulos attested that during other calls with the confidential source, Mr. Perez appeared to be nervous at his inability to reach Mr. Remingio-Martinez and gave some indication that he might leave the Reading area and travel to New Jersey. (T. 19.) Upon consideration of the communications from Mr. Perez to Mr. Remingio-Martinez and the confidential source, and the circumstances of the investigation, including the difficulty of

---

[4] At another point during the hearing, Agent Mihalopoulos testified that subsequent to his arrest, Mr. Remingio-Martinez's cell phone received calls from a phone determined to be Mr. Perez's because the incoming number matched the phone number that the confidential source had previously dialed to call Mr. Perez. (T. 67.) According to Agent Mihalopoulos, these calls were not answered because Mr. Remingio-Martinez was in custody at the time. (T. 67-68.) It is thus not clear from the transcript how many (if any) calls from Mr. Perez to Mr. Remingio-Martinez were actually answered, monitored, and recorded by law enforcement. Regardless, this ultimately is not material as the record provides ample evidence that agents did monitor numerous calls between Mr. Perez and the confidential source regarding the drug transaction. The evidence of record also supports Agent Mihalopoulos's belief that he had probable cause to arrest Mr. Perez.

3

conducting surveillance in the area of 510 Minor Street and the concern that Mr. Perez may flee to New Jersey, Agent Mihalopoulos believed that there was sufficient probable cause and exigent circumstances to arrest Mr. Perez without first securing a warrant. (T. 19-20.)

Having received information from others involved in the investigation that Mr. Perez was believed to be home, at around 7:00 p.m. on April 21, 2008, Corporal Harris, Detective Pasquale Leporace of the Reading Police Department, and five other law enforcement officers arrived at 510 Minor Street intending to place Mr. Perez under arrest. (T. 91, 114, 124.) The attending officers were not uniformed but were wearing raid vests or other attire clearly showing them to be law enforcement officers. (T. 92, 126.) The front door of the residence was open and Corporal Harris knocked on the screen door. (T. 92, 125-26.) Shortly thereafter, a woman later determined to be Francisco Perez's wife, Judy, opened the door and engaged in a brief conversation with Corporal Harris.[5] (T. 93, 126.) Soon after making contact with Mrs. Perez, officers observed Francisco Perez and another man, later identified as Hector Quiles, seated on couches in the living room. Corporal Harris testified that he saw Mr. Quiles place his hand between cushions or pillows on the couch, which suggested that he may have been either retrieving a hidden object or discarding an unknown item. (T. 114.) Upon witnessing Mr. Quiles reaching into the couch, Corporal Harris made a forced entry into the house, drew his weapon,

---

[5] Detective Leporace testified that Mrs. Perez invited the officers into the house, but the record does not bear this out. Both Corporal Harris and Detective Leporace testified that Corporal Harris knocked on the screen door and spoke with Mrs. Perez, but Corporal Harris did not testify that Mrs. Perez invited the officers inside. Corporal Harris testified that he made an armed entry into the home after witnessing Hector Quiles reach between the cushions of the couch. (T. 127.) Based on this testimony and the fact that Corporal Harris was the first officer to make contact with Mrs. Perez and to enter the home, the Court finds insufficient evidence to conclude that Mrs. Perez invited the officers into the house.

instructed the accompanying officers to watch the men's hands, and placed both men under arrest. (T. 127-28.) After officers conducted a cursory search of the couch, they discovered a bag containing a substance that appeared to be marijuana. (T. 128.)

After Messrs. Perez and Quiles were arrested, Corporal Harris asked Judy Perez to talk with him in the kitchen. During this conversation, Corporal Harris's weapon was holstered and there was only one other officer present. (T. 129.) Corporal Harris explained to Mrs. Perez why the officers had arrived at the home, the nature of the investigation that DEA was conducting, and the fact that her husband was being detained as a suspect in a drug trafficking conspiracy. (T. 129.) Corporal Harris further explained that Mrs. Perez was not suspected of any wrongdoing and was not under investigation. (T. 130.) He did ask whether Mrs. Harris had any knowledge of her husband being involved in drug trafficking; she replied that she did not. (T. 130.) At this point, Corporal Harris requested permission to search the home and read Mrs. Perez the State Police's standard consent form which, among other things, advises parties that they are not required to give their consent. (T. 130.) Following this discussion, Mrs. Perez verbally consented to Corporal Harris's request and also signed the consent form provided, as did Corporal Harris and Trooper Paul Gauntlett, who witnessed the consent process. (T. 130-131.) Mrs. Perez consented to the search approximately 10 minutes after Corporal Harris and the other officers entered the house.[6]

---

[6] At this point, officers began searching the residence. The government did not provide any evidence about what items were seized during the search, but in its brief the government represented that officers recovered approximately $1,300 in cash, an unspecified quantity of marijuana, a bag of crack cocaine, scales, and drug records. (Doc. No. 45, at 7.) The Court agrees with the United States that the type of items seized is not relevant in order to resolve the pending motion.

## III. DISCUSSION

The vast majority of the evidence taken over two days of hearings on the pending motion focused upon the warrantless arrest of Francisco Perez and whether the arrest itself properly was predicated upon the existence of both probable cause and exigent circumstances. Indeed, in his motion Defendant argues only that the search of 510 Minor Street was unlawful because the search was conducted without a warrant and exceeded the scope of a search incident to arrest. (Doc. No. 34, at 4.) The Court finds Defendant's argument unpersuasive largely because the search was conducted following consent given by Judy Perez. However, the circumstances of Defendant's arrest requires some separate discussion.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be considered.

U.S. Const. amend. IV. "One's home is sacrosanct, and unreasonable government intrusion into the home is 'the chief evil against which the wording of the Fourth Amendment is directed'." United States v. Zimmerman, 277 F.3d 426, 431 (3d Cir. 2002) (quoting Payton v. New York, 445 U.S. 573, 585 (1980)); see also Payton, 445 U.S. at 590 ("The Fourth Amendment has drawn a firm line at the entrance to the house."). Accordingly, the Supreme Court has long held that warrantless searches and seizures inside an individual's home are presumptively unreasonable and will be found unlawful absent a recognized exception to the warrant requirement. Payton v. New York, 445 U.S. 573, 586 (1980); see also Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (noting that the warrant requirement set forth in the Fourth Amendment is a "principal protection

against unnecessary intrusions into private dwellings . . . .").

The Supreme Court has "emphasized that exceptions to the warrant requirement are 'few in number and carefully delineated,' . . . and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches." Welsh,, 466 U.S. at 749-50 (quoting United States v. United States District Court, 407 U.S. 297, 318 (1972)). With respect to searches and seizures within the home, one recognized exception to the warrant requirement is where both probable cause and exigent circumstances exist to justify the intrusion before securing a warrant. Steagald v. United States, 451 U.S. 204, 211 (1981); Payton, 445 U.S. at 586; United States v. Coles, 437 F.3d 361, 365 (3d Cir. 2006); cf. United States v. Rubin, 474 F.2d 262, 268 (3d Cir. 1973) ("Probable cause to believe that contraband is present is necessary to justify a warrantless search, but it alone is not sufficient . . . . Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant."). The Court will consider separately whether probable cause and exigent circumstances existed to justify the in-home arrest of Defendant.

### A. Probable Cause

Probable cause to arrest exists when the facts and circumstances suggest that "a reasonable person [would] believe that an offense has been . . . committed by the person to be arrested." Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995). "An arrest [is] made with probable cause if 'at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense.'" Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005)

7

(quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  Probable cause determinations require analysis of the totality of the circumstances.  Illinois v. Gates, 462 U.S. 213, 238 (1983).

Upon consideration of all of the evidence presented during the hearings on this matter, the Court has little trouble concluding that law enforcement officers had sufficient probable cause to believe that Defendant was involved in narcotics trafficking.  During the course of a fast moving investigation over two days, DEA officials and state law enforcement officers were given reason to believe that the driver of a tractor trailer stopped carrying between 350 and 400 pounds of marijuana was intending to deliver the drugs to two men known at that time only as "Frank" and "Timo".  As the investigation proceeded, the driver of the tractor trailer – who became a confidential source of information, and whose reliability was made evident over the course of the investigation – confirmed the identity of "Timo" and advised officers that "Frank" lived in the area of 510 Minor Street just three houses from the confidential informant.  The informant also told law enforcement officers that "Frank" had recruited him to become involved in the drug trafficking and that he had previously delivered drugs to "Frank."

Beyond this initial information, over the course of April 20th and April 21st, Agent Mihalopoulos testified credibly that Defendant Perez engaged in telephone calls with the confidential source regarding the intended marijuana delivery, including the time of the delivery and payment for the drugs.  Thereafter, officers witnessed and videotaped Timo taking delivery of a package of marijuana at the specified meet location in Richland, Pennsylvania, and placing the drugs in Defendant's car.

Upon consideration of all of these facts, the Court finds that the investigating officers had probable cause to believe that Defendant was engaging in a drug trafficking.  The Court next

considers whether exigent circumstances existed to justify the officers' decision to arrest Defendant in his home without first obtaining a warrant.

### B. Exigent Circumstances

Although exactly what will constitute exigent circumstances may vary depending upon the particular facts of each case, the Supreme Court has identified the following factors that may justify a warrantless intrusion into the home: the imminent destruction of evidence; the need to prevent a suspect's escape; or the risk of danger to the police. Minnesota v. Olson, 495 U.S. 91, 100 (1990). The Court has further instructed that

> in the absence of hot pursuit there must be probable cause to believe that one or more of the above factors were present and that in assessing the risk of danger, the gravity of the crime and likelihood that the suspect is armed should be considered.

Id.[7] See also United States v. Coles, 437 F.3d 361, 366 (3d Cir. 2006) ("Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others."). Exigent circumstances will not be found to satisfy Fourth Amendment standards if the government deliberately creates them. Id.

The question of whether exigent circumstances existed is close but the Court ultimately

---

[7] In the related context of warrantless home searches, the Third Circuit has identified the following factors for courts to consider when evaluating the existence of exigent circumstances: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that contraband was about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is being sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics trafficking. Rubin, 474 F.2d at 268-69.

finds that the government failed to produce sufficient evidence to establish this crucial point. The government essentially argues that exigent circumstances were provided by any of the following, taken separately or collectively: (1) concern that Defendant would flee to New Jersey or elsewhere before officers could secure a warrant; (2) the chance that Defendant might destroy evidence; and (3) fear for the officers' safety after Corporal Harris observed a man seated on a couch reach his hand between couch cushions when seven officers had arrived at the Perez residence to arrest Defendant.

With respect to the first point, the Court was not convinced – as a factual matter – that officers had a genuine concern about Defendant's potential flight to New Jersey or elsewhere that could not have been addressed by placing 510 Minor Street under surveillance pending the issuance of a warrant. Although the government produced testimony that surveilling the house was difficult given the layout and demographics of the neighborhood, the Court does not perceive how these concerns equate with concern over <u>securing</u> the house and area around it. Indeed, there was testimony that Corporal Harris and others spent considerable time in the neighborhood over the course of the afternoon on April 21st and while surveillance may have been compromised it does not automatically follow that officers were unable to secure the location while a warrant could be obtained, particularly as it was not clear that officers needed to maintain secret surveillance of Perez's residence as part of its plan to arrest him.

The Court well appreciates the considered judgment that law enforcement officers must exercise, particularly in fast moving investigations such as was taking place on April 20th and April 21st. Nevertheless, the Court must consider that factor among many others within the context of the facts the government developed during the evidentiary hearings. The Court

ultimately found the evidence regarding Defendant's potential flight to New Jersey to be especially thin, and all the more so given Defendant's apparent ties to the area such as his home and family. Moreover, no officer testified that they were in "hot pursuit" of Defendant at any point during this investigation that might justify a warrantless arrest to prevent escape. Furthermore, the Court does not find support in the record for the assertion that officers were powerless to secure the area around 510 Minor Street pending issuance of a warrant.[8] For all of these reasons, the Court does not find a risk of Defendant's imminent flight justified his warrantless arrest.

The Court finds the second offered justification even less persuasive than the first. There was no substantial testimony offered to support the officers' alleged concern that Defendant might destroy evidence other than Corporal Harris's conclusory statement to that effect.[9] No officer volunteered testimony to establish that they had reason to believe that Defendant had evidence in the house much less that he might destroy it, whether or not he believed he was under surveillance. Although the Court recognizes that it may often be the case that exigent circumstances will exist after a suspect is alerted to the fact that law enforcement officers may be following him or otherwise in pursuit, see Coles, 437 F.3d at 370, in this case the government did

---

[8] Agent Mihalopoulos testified that because of the compromised surveillance efforts and the level of activity around the area of 510 Minor Street that the only choice to officers was "we go get him or if he goes out the back door, there's no way we can cover the whole block on 510 Minor." (T. 20.)

[9] Specifically, Corporal Harris was asked the following question: "[If Defendant] had made surveillance and was concerned that police were coming after him, basically, did you have any concerns about what he might do with any evidence that might be in that residence?" He responded: "I mean, there was a possibility it could be destroyed or taken out of the residence." (T. 148.)

11

not persuade the Court that the officers actually had this belief as the basis for their conclusion that exigent circumstances existed. In fact, Corporal Harris testified that Agent Mihalopoulos directed him to take the rest of his team to 510 Minor Street to arrest Perez only because "he was going to be leaving the area and going to New Jersey at that time" and that he was believed to be at home. (T. 123.) Until prompted by counsel for the government, Corporal Harris gave no indication that officers had genuine concern that Defendant might destroy or remove evidence. The record developed in this proceeding simply does not provide a sufficient basis for the Court to find that the potential for destruction of evidence provided the requisite exigent circumstances to justify a warrantless in-home arrest.

The last ground offered by the government in support of a finding of exigent circumstances is the fact that while he was speaking with Judy Perez at the front door, Corporal Harris observed Hector Quiles place his hands between the cushions or pillows of the couch on which he was seated inside Defendant's home. Corporal Harris and Detective Pasquale (who did not see Mr. Quiles reach between the cushions) both testified that this fact gave officers concern that Mr. Quiles could be reaching for a weapon because the officers were at the home in connection with a drug investigation and drug traffickers often carry weapons.

Although the officers believed that exigent circumstances existed before even knocking on Defendant's front door, the Court has found that the government insufficiently developed the evidentiary record to allow the Court to make such a finding. Accordingly, unable to find that exigent circumstances existed before the officers' arrival at the home, the Court must consider whether Corporal Harris's lone observation of Hector Quiles placing his hand between pillows or cushions while seated on the couch provided the necessary exigent circumstances to allow

12

officers to force their way into the home and place both Quiles and Perez under arrest.

The Court emphasizes its awareness of and sensitivity to the very real dangers faced by law enforcement officers who are investigating serious drug offenses and other criminal activity often associated with violence. For this reason in particular, the Court has considered especially carefully the evidence presented in support of the officers' belief that they faced a genuine risk of harm while on the porch of 510 Minor Street that justified their entry into the home in order to arrest Messrs. Perez and Quiles. Notwithstanding this careful consideration, the Court ultimately concludes that the government failed to offer sufficient evidence and legal support for its contention that Mr. Quiles's act of reaching into couch cushions supplied the requisite exigent circumstances to authorize the warrantless arrest of Mr. Perez inside of his home.

Having found insufficient evidence to support a finding of exigency on the basis of flight or destruction of evidence, the government is left only with the suspicious actions of a non-suspect that it relies upon to justify Mr. Perez's arrest inside of his own house – which Corporal Harris intended to do in any event, provided he and his team found Mr. Perez at home.[10] Corporal Harris admitted that prior to arriving at the home he had no information that would lead him to believe that Hector Quiles was armed and dangerous. (T. 141.) The record makes clear that the officers who arrived at Mr. Perez's house had shown up specifically to arrest Mr. Perez and that they believed they had authority to do so on the basis of circumstances they believed were exigent – before ever witnessing Mr. Quiles's actions. The Court does find that the government justified Corporal Harris's entry into Mr. Perez's house in order to neutralize what

---

[10] On cross examination Corporal Harris was asked "[Y]ou were going there to arrest him if he was there, right?" (T. 140.) Corporal Harris answered, "If he was inside and if he was located, yes." (Id.)

he perceived as a potential threat to him and other officers. The Court also finds that the officers' detention of Mr. Quiles was justified on this ground. But on the record the government developed, the Court cannot find that Mr. Quiles's limited action – which appears to have been an attempt to hide a small amount of substance suspected to be marijuana – can be used to support the arrest of Mr. Perez. No officer testified that he witnessed Mr. Perez take any threatening action before or after he entered the home, or that there was any other independent basis aside from Quiles's reach into the couch cushions that could support a finding of exigent circumstances to justify arresting Mr. Perez in his house without a warrant. In addition to the lack of factual support, the government identified no legal support for the proposition that where limited exigent circumstances authorize police officers to enter a home without a warrant to respond to an isolated threat from one individual that they can rely upon that exigency to arrest others in the home – even if the officers have probable cause to believe these individuals may be engaged in criminal activity. Mindful that the exigency exception to the warrant requirement is narrow in any case, the Court finds that in this particular case there is simply insufficient factual and legal support to justify Mr. Perez's arrest – much less a full search of his home – based strictly upon an exigency that related exclusively to Mr. Quiles.[11] Accordingly, upon careful consideration of the evidence presented, the Court finds that the warrantless arrest of Mr. Perez

---

[11] In cases where exigent circumstances authorize police to conduct a warrantless search, the Supreme Court has emphasized that the "search must be 'strictly circumscribed by the exigencies which justify its initiation.'" Mincey v. Arizona, 437 U.S. 385, 393 (1978) (quoting Terry v. Ohio, 392 U.S. 1, 25-26 (1968)). The government has not argued that a more relaxed standard applies in the case of warrantless arrests. Moreover, Corporal Harris testified that officers recovered a small bag containing a substance suspected to be marijuana from the location where Mr. Quiles reached into the cushions. No officer testified that there was any further exigency presented following this discovery.

was not properly supported by both probable cause and exigent circumstances.

   **C.   Consent**

   Nevertheless, the fact that Defendant's warrantless arrest may have been improper does not necessarily require the Court to find that the subsequent search of Defendant's residence was unlawful. The government provided essentially unchallenged and credible testimony that Judy Perez voluntarily acceded to Corporal Harris's request for consent to search the house and that the attending officers did not conduct a full-scale search of the home prior to obtaining such consent.

   As with the contexts of warrantless arrests discussed above, a search conducted without a warrant is considered per se unreasonable and a violation of the Fourth Amendment unless the search falls within a specifically established exception. Katz v. United States, 389 U.S. 347, 357 (1967). "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Furthermore, "[t]he consent of one who possesses common authority over premises or effects is valid against the absent, non-consenting person with whom that authority is shared." United States v. Matlock, 415 U.S. 164, 170 (1974); see also Georgia v. Randolph, 547 U.S. 103, 106 (2006) ("The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.").[12]

---

   [12]   At the close of the second hearing in this matter, Defendant's counsel argued that the officers should have requested that Mr. Perez consent to the search "because they're his Fourth Amendment rights that we're talking about . . . ." (T. 157.) In Georgia v. Randolph, the

The Third Circuit has identified a number of factors for courts to consider when evaluating whether consent was voluntarily given, including the age of the party, her education, her intelligence, whether she was advised of her constitutional rights, and whether questioning was repeated or prolonged. United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994). "[W]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Schneckloth, 412 U.S. at 227. Nor is the government obligated to advise the consenting party that she may refuse consent before eliciting consent. Kim, 27 F.3d at 955.

In this case the testimony established that Judy Perez consented voluntarily to Corporal Harris's request for permission to search the residence. Corporal Harris testified credibly that following the arrest of Messrs. Perez and Quiles he asked Mrs. Perez to speak with him in the kitchen. This conversation was conducted in a non-threatening manner and included Corporal Harris explaining to Mrs. Perez the circumstances that lead to the arrest of her husband and the fact that she herself was not suspected of wrongdoing. Furthermore, Corporal Harris explained

---

Supreme Court did hold that "a physically present inhabitant's express refusal to consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." 547 U.S. 103, 122-23 (2006). However, in so holding the majority drew a distinction that forecloses Defendant's argument:

> [W]e have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

Id. at 121. The officers did not ask Defendant to consent to the search and were not required to do so. In accordance with the Supreme Court's holdings in Randolph and Matlock, Mrs. Perez's consent alone was sufficient.

16

to Mrs. Perez that she was lawfully permitted to refuse his request for consent. The evidence shows that following this conversation, Mrs. Perez agreed orally and in writing to Corporal Harris's request for consent to search the home. The evidence also shows that officers did not begin a comprehensive search of the house until after Mrs. Perez consented to the request.

Before concluding, the Court pauses to consider what effect, if any, the improper warrantless arrest of Mr. Perez had upon Mrs. Perez's subsequent consent. This inquiry is necessary to determine whether Mrs. Perez's consent, even if found to have been voluntary, nevertheless requires exclusion of the evidence found during the subsequent search because it was the "fruit of the poisonous tree" – as the product of the original unlawful entry into the home. See Brown v. Illinois, 422 U.S. 590, 603-04 (1975). The United States Court of Appeals for the Eleventh Circuit, in considering a case somewhat similar to the instant case, clearly explained this inquiry as follows:

> For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure. Thus, the voluntariness of consent is only a threshold requirement; a voluntary consent to search does not remove the taint of an illegal seizure. Rather, the second requirement focuses on causation: "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007) (considering consent to search given by defendant's girlfriend following protective sweep of home assumed to be unlawful for purposes of opinion) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)); see also United States v. Schettler, No. 01-2331, 32 F. App'x 14, *15 (3d Cir. Jan 29, 2002) ("Having

found that [the defendant] was illegally seized, the district court was obligated to analyze the subsequent statements and evidence under the fruit of the poisonous tree doctrine."). The factors to be considered in such inquiry are "the temporal proximity of the arrest and the [consent], the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct." Brown, 422 U.S. at 603-04.

Applying these factors in this case, the Court finds that Mrs. Perez's consent was sufficiently independent of the warrantless in-home arrest so as to be lawful. Although only ten minutes elapsed from the time officers arrested Defendant to the point where Mrs. Perez consented to the search, the evidence reveals that Mrs. Perez was at no time restrained or otherwise detained by officers. During the intervening period between Defendant's arrest and Mrs. Perez's consent, Corporal Harris peaceably requested for consent to search the home and explained that Mrs. Perez was free to decline such request. The Court finds that Corporal Harris's explanation regarding the circumstances of the investigation, the fact that Mrs. Perez was not suspected of wrongdoing, and the fact that Mrs. Perez could refuse consent provide significant intervening factors between the improper entry into the home and Mrs. Perez's subsequent consent to search. Furthermore, although the Court found that the government failed to present sufficient evidence to demonstrate that exigent circumstances existed to allow a warrantless, in-home arrest, the Court does not find that the arresting officers' conduct was flagrant or driven by an improper purpose. On balance, the Court concludes that Mrs. Perez's consent to search the home was both voluntary and not tainted by Defendant's warrantless arrest. Accordingly, the Court finds that the officers' search of Defendant's home was lawfully conducted and Defendant's motion to suppress the items seized during the search must be

18

denied.

## IV. CONCLUSION

For all of the reasons set forth above, the Court finds that the search of Defendant's home at 510 Minor Street was conducted lawfully upon the express consent of Judy Perez and that Mrs. Perez's consent was not tainted by the improper warrantless arrest of Defendant. For this reason, Defendant's motion to suppress evidence seized during the search must be denied. An order consistent with this memorandum follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Criminal No. 1:08-CR-171-2 |
| v. | : | |
| | : | (Chief Judge Kane) |
| FRANCISCO D. PEREZ, | : | |
| | : | |
| Defendant | : | |

## ORDER

AND NOW, this 21st day of May 2009, upon consideration of Defendant's motion to suppress evidence seized during a search of his home, and an amended motion seeking the same relief (Doc. Nos. 32, 33), and for the reasons set forth in the within memorandum, IT IS HEREBY ORDERED THAT the motions are DENIED.

/s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania
